GREENE v. WILLIAMS.[1]

1. CONDITIONAL SALE — CHATTEL MORTGAGE — SATISFACTION —
   RIGHTS OF CREDITORS OF VENDEE.
   Where the purchaser of a stock of goods under a contract pro-
   viding that the title to the original stock, and all additions
   thereto, shall be and remain in the vendor until payment of
   the purchase price, turns the goods over to the vendor, in
   good faith, in satisfaction of the contract, and the value of
   the goods does not greatly exceed the amount of the debt,

---

[1] Rehearing denied June 24, 1902.

creditors of the vendee cannot complain, notwithstanding
the contract was not recorded as a chattel mortgage.

2. SAME—EVIDENCE—QUESTION FOR JURY.
   The submission to the jury of the question whether a stock of
   goods was turned over to plaintiff in payment and satisfac-
   tion of a contract of conditional sale was warranted by the
   testimony of plaintiff that the vendee asked him to come to
   the store the next day, and "he would turn over the stock to
   me in satisfaction of the contract," and that the goods were
   at the appointed time delivered to him in payment of the
   contract, although on cross-examination he testified to things
   that appeared to be inconsistent with the theory of a sale.

3. SAME—TRIAL—SPECIAL QUESTIONS.
   Where, in an action of trover, the court instructed the jury
   that plaintiff could not recover unless the goods in question
   had been turned over to him, in good faith, in satisfaction of
   his claim, defendant was not prejudiced by the refusal of the
   court to submit a special question as to whether plaintiff took
   possession by virtue of a contract of conditional sale.

Error to Calhoun; Winsor, J. Submitted April 25,
1902. (Docket No. 69.) Decided June 3, 1902.

Trover by George H. Greene, executor of the last will
and testament of James F. Smiley, deceased, against
Herbert R. Williams, sheriff of Calhoun county. From a
judgment for plaintiff, defendant brings error. Affirmed.

Plaintiff's decedent, James F. Smiley, being the owner
of a stock of drugs, medicines, and other goods, on April
30, 1890, entered into a contract to sell the same to one
W. F. Church. The contract was in writing. The con-
sideration was to be $5,700; the terms of payment being
$300 down, and $300 annually until paid. Church agreed
to pay all the taxes on the goods then conveyed, or pur-
chased to replenish the stock, and to keep said goods, and
additions thereto, insured. It also provided that said
Church—

"Shall have and take immediate possession of the said
stock of goods and property as above described, and, upon
the condition that he shall at all times keep the stock

replenished with like or equally salable goods to the amount and value substantially as at the date of this contract, he shall be allowed to go on with the business in his own name and on his own account, and make sales of said goods at retail in the usual and customary manner of retail trade, but not otherwise; and all goods and property acquired and put with the said goods, or with any part thereof, for sale in said business, either to replenish the said stock or as additions thereto, shall, to the amount and value of the said stock and property as it now is, be and remain the property of the said party of the first part, and be held under this contract the same in all respects as the goods and property hereby agreed to be sold, and shall so continue so long as any part of the principal or interest of any of the moneys to be paid as herein provided shall remain unpaid."

The contract further provided that if said Church should neglect or refuse to keep the stock of goods replenished, or should sell or attempt to sell in any other manner than in the usual and customary course of trade at retail, or should neglect or refuse to pay all just claims and demands of any and every person for goods used to replenish such stock, when such claims should become due and payable, or if he should at any time incumber or allow said goods, or additions thereto, to be incumbered or seized upon attachment or execution, or should neglect to pay as provided, then—

"It shall and may be lawful, and the said party of the first part shall be and is authorized, to take immediate possession of any or all of the said goods and property, wherever the same may be, and of any or all goods or property that may have been acquired to replenish or make additions thereto, and to sell and dispose of the same, either at public or private sale, as he may deem best calculated to secure the best price, and with moneys or means realized therefrom to pay and satisfy any and all demands that may be owing him under the provisions of this contract; all of which demands shall in such case be and become immediately due and payable, though the period above limited may not then have expired; the surplus, if any, to be returned to the said party of the second part, after paying the expenses of taking the possession and selling the same in the manner aforesaid."

It further provided that, upon payment by Church, Smiley would "execute and deliver to him a good and sufficient bill of sale of the goods and property aforesaid." The above are the parts of the contract essential to understand the questions involved.

Mr. Church carried on the business until December 28, 1892, when another contract was signed between Smiley, Church, and Solomon M. Raftery, by which the contract was assigned to Solomon M. Raftery, and he assumed all the obligations under it.   At that time there was due upon the contract $4,227.15.   Raftery failed to pay as provided in the contract, and plaintiff, as the executor of Mr. Smiley's estate, made demand and obtained possession of the goods on October 11, 1899, retaining Raftery in his employ for a while to assist in selling the goods.   After Raftery was discharged from plaintiff's employ, several suits were brought in justices' courts by his (Raftery's) creditors.   He confessed judgment, executions were issued, and the stock was levied upon by the defendant, the sheriff of the county, through his deputy.   Plaintiff thereupon brought suit in trover for the value of the goods so seized.   The defenses set up were:

1. That the agreement was in effect a chattel mortgage, and, never having been recorded, was absolutely void as against Raftery's creditors.

2. If not a mortgage, it was a conditional sale, and covered only the goods then in existence, and did not include goods purchased afterwards by Raftery.

3. That Mr. Smiley was estopped from setting up a claim to the goods as against the creditors of Raftery.

The court, after stating the claims of the respective parties, instructed the jury that if they found that this contract had never been recorded in the clerk's office in the city of Albion, where the property was located, or in the city of Marshall, where Mr. Smiley lived, then the contract was void as to creditors of Raftery who sold him goods in good faith after the contract was made; that the contract was valid as to all the goods which were in ex-

istence at its date, and were then transferred to Raftery. The court further instructed the jury as follows:

"If you find from the evidence here in the case that at the time Dr. Greene, the executor of the estate of James F. Smiley, deceased, took possession of the stock and store, that there was an express understanding and agreement between himself and Solomon M. Raftery that Mr. Raftery should turn out to Dr. Greene, as executor, the stock in question, expressly for the purpose of paying the indebtedness owing the estate of Dr. James F. Smiley, and that he did so pay it by turning out the stock, and it was so taken and so delivered, then I instruct you that the title of the Dr. Smiley estate, or the plaintiff here, in this property so turned out, would be good to all the property so turned out to him, if done in good faith, as against any of the creditors of Solomon M. Raftery."

The defendant requested the court to give to the jury five special questions, the first and second of which are as follows:

"1. When Dr. Greene, as executor, took possession of the property, October 11, 1899, did he do so under and by virtue of the provisions of the agreement between Smiley and Raftery dated December 28, 1892, and not otherwise?
"2. Did the sheriff levy upon any of the original stock of James F. Smiley under the execution issued in favor of Williams, Davis, Brooks & Hinchman Sons?"

The other three questions were the same as No. 2, except that they included other creditors of Raftery. The judge refused to submit these questions. Plaintiff recovered verdict and judgment.

*Loud & Stewart*, for appellant.

*John E. Foley*, for appellee.

GRANT, J. (*after stating the facts*). Under the instructions given and the finding of the jury, it is unnecessary to determine whether this agreement was a chattel mortgage, a conditional sale, or whether the provision of the contract covering future additions to the stock was

valid. The jury, of course, determined that the contract was not recorded or filed, because that was conceded. Neither was there any question of the good faith of Mr. Raftery's creditors in selling the goods to him. Therefore the verdict was based entirely upon the finding of the jury that these goods were turned over by Raftery to plaintiff in consideration and payment of the debt due to him under the contract. If there was evidence to go to the jury upon this point, it is evident that the judgment must be sustained.

Plaintiff expressly testified that on October 10th he, with his attorney, demanded possession of the goods under the contract; that Raftery asked them to come the next day, and "he would then turn over the stock to me [plaintiff] in satisfaction of the contract;" that on the 11th Raftery did deliver him the goods in payment of the contract. It is true that on cross-examination he testified to certain things that appeared to be inconsistent with the theory of a sale; but they were not, as a matter of law, convincing, and we are unable to say that it was not a proper question for the jury. Plaintiff had the legal right to receive the goods, and Raftery had the legal right to turn them over to him, in payment of the debt, provided it was done in good faith, and the value of the goods did not exceed the amount of the debt to such extent as to be itself a badge of fraud. This finding renders the other questions raised by the record immaterial. The verdict was a complete answer to the first special question, because the jury, under the instructions, could not have found a verdict for plaintiff upon any other basis than that Raftery surrendered the goods in payment of the debt.

The judgment is affirmed.

HOOKER, C. J., MOORE and MONTGOMERY, JJ., concurred. LONG, J., did not sit.